IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF SOUTH CAROLINA
FLORENCE DIVISION

| | | |
|---|---|---|
| PLAINTIFF(S) | ) | CIVIL ACTION No.: |
| Peggy Marchant | ) | |
| | ) | |
| vs. | ) | **COMPLAINT** |
| | ) | (Jury Trial Requested) |
| DEFENDANT(S) | ) | |
| Dolgencorp, LLC d/b/a Dollar General | ) | |
| | ) | |

COMES NOW, Plaintiff Peggy Marchant, by and through undersigned counsel, brings this action against Defendant Dolgencorp, LLC d/b/a Dollar General, and alleges as follows:

### INTRODUCTION

This case concerns a long-tenured female Regional Asset Protection Manager who asked to be paid fairly and equally to male peers performing the same job and was terminated weeks later based on stale, vague, and untested complaints never previously raised with her.

For nearly eight years, Ms. Marchant worked for Dollar General without discipline in a demanding loss-prevention role involving cash shortages, shrink, audits, vendor compliance, and internal theft. On February 6, 2025, she told her supervisor, Patrick Kernell, that male Regional Asset Protection Managers were being paid more for the same work and that she wanted equal treatment. Rather than meaningfully investigate the disparity, Defendant gathered old and newly framed complaints about her communication style, issued no progressive discipline, conducted no interview, and gave her no opportunity to respond. On March 21, 2025, Defendant terminated her.

Defendant's explanation does not withstand scrutiny. The phrase "Where's my money?" was routine asset-protection language referring to missing cash, shortages, deposits, and shrink—not a racial statement. Peer witnesses confirm the phrase carried no racial meaning in Dollar General's loss-prevention context. Defendant's own pay data also confirms that multiple male Regional Asset Protection Managers reporting to the same supervisor earned more than Ms. Marchant, including younger and later-hired male employees. Defendant's conduct violated Title VII and, to the extent applicable, the Equal Pay Act.

### PARTIES

1.    Plaintiff Peggy Marchant is a resident of Horry County, South Carolina.

2.    Defendant Dolgencorp, LLC d/b/a Dollar General is a foreign limited liability company doing business in South Carolina.

3. Defendant employed Ms. Marchant within the meaning of Title VII and the Equal Pay Act.

4. At all relevant times, Defendant employed more than fifteen employees.

5. This Court has federal-question jurisdiction under 28 U.S.C. § 1331.

6. This Court has jurisdiction over Plaintiff's Title VII claims pursuant to 42 U.S.C. § 2000e-5(f)(3).

## JURISDICTION AND VENUE

7. This Court has jurisdiction over Plaintiff's Equal Pay Act claim pursuant to 29 U.S.C. § 216(b).

8. Venue is proper in this District because the unlawful employment practices occurred in this District, relevant employment records are maintained or administered in this District or affect employment in this District, and/or Plaintiff worked in this District.

9. Additionally, Plaintiff was recruited from Horry County and hired to work in South Carolina where she would have continued working but for the adverse action.

10. A majority of the district managers who are fact witnesses in this case also live in South Carolina.

11. Plaintiff resides in Horry County, South Carolina presently and during the relevant period. She performed substantial work for Defendant from Horry County and throughout South Carolina. She oversaw South Carolina stores and district managers, including stores and witnesses located in this District. She would have continued working in South Carolina but for Defendant's unlawful termination. The February 6, 2025 protected activity occurred during travel/work connected to Plaintiff's South Carolina employment, and the termination was communicated to Plaintiff while she was located in South Carolina.

12. Plaintiff timely filed a Charge of Discrimination with the Equal Employment Opportunity Commission, Charge No. 494-2025-03232.

13. The EEOC issued Plaintiff a Notice of Right to Sue on or about May 13, 2026.

14. Plaintiff files this action within ninety days of receiving the Notice of Right to Sue.

## FACTUAL ALLEGATIONS

15. Dollar General hired Ms. Marchant on or about April 8, 2017.

16. Ms. Marchant served as a Regional Asset Protection Manager, commonly referred to as a RAPM.

17. As a RAPM, Ms. Marchant was responsible for reducing shrink, investigating cash shortages, supporting store and district leadership, conducting SAVE and HSAP audits, enforcing vendor and cash-control procedures, and helping stores correct loss-prevention failures.

18. Ms. Marchant performed her job successfully.

19. Before the events giving rise to this lawsuit, Ms. Marchant had no disciplinary history.

20. Ms. Marchant's work required direct and sometimes firm communication. The role required her to identify deficiencies, explain why policies were not followed, and hold store and district leadership accountable for cash, shrink, audit, and vendor-control issues.

21. Ms. Marchant's direct supervisor was Patrick Kernell.

22. In early 2025, Ms. Marchant learned that male RAPMs performing the same job were earning more than she was.

23. Several of those male RAPMs had less tenure, less relevant training, or lacked credentials Ms. Marchant had obtained, including Certified Forensic Interviewer-related training or certification.

24. On February 6, 2025, after traveling with Mr. Kernell, Ms. Marchant raised the issue of her pay.

25. Mr. Kernell asked what she meant. Ms. Marchant told Mr. Kernell that male peers on the team were making more money than she was while doing the same job.

26. Mr. Kernell asked why she thought some male peers were making more money.

27. Ms. Marchant responded that members of the team discussed compensation among themselves.

28. Mr. Kernell attempted to minimize the issue by stating words to the effect that he had female peers making more money than him with fewer years.

29. Ms. Marchant responded that they were not talking about his pay, but hers, and that she wanted to be treated fairly and equally to her male peers.

30. Ms. Marchant asked Mr. Kernell to point her to the right person if he was not the proper person to address equal pay.

31. Mr. Kernell's tone changed, and he stated words to the effect of, "I am your boss and would hope you'd come to me first before speaking with anyone else."

32. Ms. Marchant explained that she was coming to him because he was her boss, but again asked to be directed to the correct person if he could not address the issue.

33. Mr. Kernell told her to give him a couple of days to investigate it and said he would get back to her.

34. On February 11, 2025, Mr. Kernell called Ms. Marchant about hotel arrangements for an upcoming Charlotte meeting.

35. During that call, Ms. Marchant asked whether he had spoken with anyone regarding her equal pay concern.

36. Mr. Kernell stated that he had not.

37. Ms. Marchant reminded him that he had asked for a couple of days and that approximately a week had passed.

38. Mr. Kernell stated that he would let her know when he had an answer.

39. Ms. Marchant responded that she was only asking to be treated fairly and equally.

40. Mr. Kernell stated words to the effect of, "I'm working on it."

41. On February 18 and 19, 2025, during a Charlotte meeting, Ms. Marchant again raised the equal pay issue with Mr. Kernell.

42. Mr. Kernell again stated that he had not spoken with anyone.

43. Ms. Marchant asked who he needed to speak with.

44. Mr. Kernell identified Scott Hamilton, an HR Director.

45. Ms. Marchant asked why they could not address the issue together while they were all present.

46. Mr. Kernell stated that he would handle it and that Mr. Hamilton had just returned to the division.

47. Ms. Marchant responded that Mr. Hamilton was not new to the division and again questioned whether she should speak with him herself.

48. Mr. Kernell stated words to the effect of, "Peggy, I'm prepared," and again said he would speak with Mr. Hamilton.

49. Ms. Marchant understood that she had clearly raised a sex-based pay disparity and asked for equal treatment relative to male peers.

50. Defendant understood or reasonably should have understood that Ms. Marchant was complaining of gender-based pay discrimination.

51. Shortly after Ms. Marchant raised these concerns, Defendant began relying on complaints about Ms. Marchant that had not previously been disclosed to her.

52. Several alleged complaints concerned events from December 2024 and January 2025.

53. Defendant did not contemporaneously notify Ms. Marchant of those alleged complaints.

54. Defendant did not interview Ms. Marchant about those alleged complaints.

55. Defendant did not provide Ms. Marchant with progressive discipline.

56. Defendant did not provide Ms. Marchant with coaching, counseling, or any opportunity to correct alleged communication concerns.

57. Defendant did not provide Ms. Marchant with dates, witnesses, stores, or details sufficient to respond before terminating her.

58. One complaint involved the phrase "Where's my money?" or similar language.

59. In Dollar General's asset-protection context, "Where's my money?" was commonly used to refer to missing cash, missing deposits, unexplained shortages, EBRs, cash variance, and shrink.

60. Ms. Marchant used the phrase in routine loss-prevention work.

61. Other RAPMs used the phrase.

62. Peer witnesses confirm that the phrase had no racial or ethnic meaning in the asset-protection context.

63. Peer witnesses further confirm that they never heard Ms. Marchant make racist comments, mimic accents, call anyone stupid, or use racially charged language.

64. Defendant nevertheless treated the phrase and related vague allegations as grounds for termination.

65. Another alleged complaint concerned a store audit involving a Little Debbie vendor rack.

66. That incident occurred months earlier, in December 2024, during a SAVE audit at Store 7093 in Hartsville, South Carolina.

67. The issue involved vendor noncompliance with Dollar General's MAG book and product placement requirements.

68. District Manager Jamie DeBose was present.

69. A store manager became emotional when confronted with repeated vendor noncompliance.

70. The incident was not treated as misconduct by Ms. Marchant when it occurred.

71. Another alleged complaint concerned a January 2025 audit with District Manager Kenny Exler.

72. Ms. Marchant asked accountability questions concerning an HSAP store and stated words to the effect that it was the district manager's job to ensure necessary corrective action occurred.

73. The alleged statement was not treated as misconduct when it occurred.

74. Another alleged complaint concerned an external candidate for a store manager position.

75. Ms. Marchant questioned the candidate about shrink, employee theft, vendor loss, and high-shrink store experience.

76. The candidate was applying for an HSAP store and could not adequately explain shrink or loss-prevention issues.

77. Ms. Marchant nonetheless agreed to give the candidate another opportunity through an in-person interview.

78. After that interview, Ms. Marchant supported moving forward with the candidate.

79. The candidate later proved ineligible or unsuitable because she had already accepted or pursued another role in a different region without disclosing that fact.

80. Defendant also relied on a handwritten note dated March 19, 2025, concerning Store 17727 in Sneads Ferry, North Carolina.

81. The note misstated Ms. Marchant's name and title.

82. The note attributed inflammatory language to Ms. Marchant without meaningful corroboration.

83. The note arose two days before Ms. Marchant's termination.

84. The store at issue had failed audit and safety compliance requirements.

85. Ms. Marchant's work at that store involved ordinary asset-protection and audit controls, including expired-product review, camera review, and vendor floor-stack compliance.

86. Defendant's reliance on this note further reflects post-hoc papering rather than contemporaneous discipline.

87. Peer RAPM Robert Petry confirmed that he had never heard complaints about Ms. Marchant before her termination.

88. Mr. Petry further confirmed that the phrase "Where's my money?" had no racial meaning in his experience and was used in the context of cash accountability and shrink.

89. Mr. Petry further confirmed that, in his experience, an RAPM would ordinarily be informed and coached if complaints were made about communication style.

90. Mr. Petry found it unusual that multiple complaints would surface months later without the RAPM being told or coached first.

91. District Manager Jessica Lemaire confirmed that "Where's my money?" was a routine loss-prevention phrase concerning cash shortages and EBRs.

92. Ms. Lemaire witnessed tense and unprofessional interactions between Ms. Marchant and Mr. Kernell during an audit.

93. Ms. Lemaire overheard Ms. Marchant ask Mr. Kernell about her review and pay increase because she was making less than male RAPMs.

94. Ms. Lemaire understood that scrutiny against Ms. Marchant increased after she raised pay concerns.

95. Ms. Lemaire further confirmed that she did not witness Ms. Marchant call anyone stupid or act in a racially offensive way.

96. Ms. Lemaire also described an incident where Wes McCarty instructed her to take action she believed would violate Dollar General policy concerning storage of company assets in a U-Haul truck.

97. When Ms. Lemaire consulted Ms. Marchant, Ms. Marchant corrected the issue and advised that proper approval was required.

98. Ms. Lemaire believed Ms. Marchant protected her from potential discipline by preventing a policy violation.

99. Peer RAPM Cynthia Malizia confirmed that she worked with Ms. Marchant for approximately six years.

100. Ms. Malizia testified that she was shocked by Ms. Marchant's termination because she believed Ms. Marchant did a great job.

101. Ms. Malizia confirmed that she had never heard Ms. Marchant make racist comments.

102. Ms. Malizia confirmed that "Where's my money?" was a common phrase used in asset protection to refer to missing deposits, missing money, cash shortages, and shrink.

103. Ms. Malizia confirmed that she herself used the phrase and that she had heard peers use it.

104. Ms. Malizia confirmed that the phrase had no racial, ethnic, or discriminatory meaning.

105. Ms. Malizia confirmed that complaints against employees are normally investigated by talking to both parties, obtaining statements, and allowing the accused employee to respond.

106. Ms. Malizia stated that it would be unusual for multiple complaints to surface months later without the employee being informed.

107. Ms. Malizia confirmed that Ms. Marchant discussed compensation concerns with her, including concerns that her pay was different from peers.

108. Ms. Malizia confirmed that Ms. Marchant asked about her compensation and that there was no known prohibition on employees discussing pay.

109. Ms. Malizia further testified that she has suspected that male peers may make more than female peers.

110. Defendant's own pay data confirms that Ms. Marchant's concern was reasonable.

111. In its September 26, 2025 submission to the EEOC, Defendant produced salary information for RAPMs reporting to Patrick Kernell during February–March 2025.

112. That document shows Ms. Marchant earned $100,117.

113. The same document shows multiple male RAPMs earned more than Ms. Marchant, including male RAPMs earning $102,514, $106,605, $112,615, $112,815, $113,596, $115,243, and $123,439.

114. Defendant's own data therefore shows seven male RAPMs earning more than Ms. Marchant while reporting to the same supervisor.

115. Defendant did not produce full pay-band data, bonus/equity data, geographic adjustment data, performance-rating data, certification data, or decisionmaker rationale sufficient to justify the disparities.

116. Defendant did not include 2025 evaluation increases in the pay figures it provided.

117. Defendant's own production corroborates Ms. Marchant's protected complaint that male peers were paid more for the same job.

118. On March 21, 2025, Mr. Kernell and Mr. Hamilton informed Ms. Marchant that Dollar General was ending her employment.

119. Ms. Marchant was blindsided.

120. Defendant did not meaningfully explain the complaint.

121. Defendant did not identify the complainant, the alleged statement, the location, or the date.

122. Defendant did not interview Ms. Marchant before terminating her.

123. Defendant did not permit Ms. Marchant to respond.

124. Defendant's internal communication to other employees did not accurately state that Ms. Marchant had been terminated for misconduct.

125. Instead, employees were told only that she was no longer with the company or that she had decided to leave.

126. Defendant's proffered reasons are false, exaggerated, selectively enforced, and unworthy of credence.

127. Defendant terminated Ms. Marchant because she complained of sex-based pay inequality and/or because of her sex.

**COUNT I**
**TITLE VII SEX DISCRIMINATION**
**42 U.S.C. § 2000e-2**

128. Plaintiff incorporates the preceding paragraphs as if fully set forth herein.

129. Ms. Marchant is female.

130. Ms. Marchant was qualified for her position as RAPM.

131. Ms. Marchant performed her job satisfactorily.

132. Defendant subjected Ms. Marchant to adverse employment action, including termination.

133. Defendant treated Ms. Marchant less favorably than similarly situated male employees.

134. Male RAPMs performing the same job were paid more than Ms. Marchant.

135. Male employees and leaders were afforded more favorable treatment, including coaching or corrective opportunities rather than immediate termination for communication or demeanor concerns.

136. Defendant deviated from ordinary disciplinary and investigative practices in Ms. Marchant's case.

137. Defendant's stated reasons for termination were false, inconsistent, solicited after protected activity, and pretextual.

138. Defendant discriminated against Ms. Marchant because of sex.

139. As a direct and proximate result of Defendant's unlawful discrimination, Ms. Marchant suffered lost wages, lost benefits, emotional distress, reputational harm, and other damages.

**COUNT II**
**TITLE VII RETALIATION**
**42 U.S.C. § 2000e-3**

140. Plaintiff incorporates the preceding paragraphs as if fully set forth herein.

141. Ms. Marchant engaged in protected activity when she opposed sex-based pay inequality.

142. Specifically, she told Mr. Kernell that male peers performing the same RAPM job were making more than she was and that she wanted to be treated fairly and equally to her male peers.

143. Title VII does not require an employee to use legal terminology or submit a formal written complaint. Ms. Marchant engaged in protected activity when she identified male comparators, stated that they were performing the same RAPM job while being paid more, and requested fair and equal treatment.

144. Ms. Marchant repeated and followed up on this equal-pay complaint on February 11, 2025, and February 18–19, 2025.

145. Defendant knew of Ms. Marchant's protected activity.

146. Defendant subjected Ms. Marchant to materially adverse action by terminating her employment.

147. The termination occurred within weeks of Ms. Marchant's protected activity.

148. After Ms. Marchant complained of unequal pay, Defendant solicited, gathered, and relied upon stale and vague complaints that had not been contemporaneously raised with her.

149. Defendant did not interview Ms. Marchant.

150. Defendant did not afford Ms. Marchant an opportunity to respond.

151. Defendant did not apply progressive discipline.

152. Defendant's stated reasons were pretextual.

153. But for Ms. Marchant's protected activity, Defendant would not have terminated her.

154. Defendant retaliated against Ms. Marchant in violation of Title VII.

155. As a direct and proximate result of Defendant's unlawful retaliation, Ms. Marchant suffered lost wages, lost benefits, emotional distress, reputational harm, and other damages.

## COUNT III
## EQUAL PAY ACT
## 29 U.S.C. § 206(d)

156. Plaintiff incorporates the preceding paragraphs as if fully set forth herein.

157. Defendant is an employer covered by the Equal Pay Act.

158. Ms. Marchant performed work requiring equal skill, effort, and responsibility under similar working conditions as male RAPMs.

159. Male RAPMs performed substantially equal work.

160. Defendant paid male RAPMs more than Ms. Marchant.

161. The pay differential was not based on seniority, merit, quantity or quality of production, or any factor other than sex.

162. Defendant's own pay data shows that multiple male RAPMs reporting to the same supervisor earned more than Ms. Marchant.

163. The RAPMs reporting to Patrick Kernell operated as part of the same Asset Protection department, reported through the same management structure, were governed by the

same policies, performed the same core job duties, were evaluated under the same performance system, and were compensated through centralized pay practices. Although RAPMs covered different territories, the differences in territory did not materially alter the skill, effort, responsibility, or working conditions of the job.

164. Defendant failed to produce legitimate, sex-neutral pay variables sufficient to explain the disparity.

165. Defendant violated the Equal Pay Act.

166. Defendant's violation was willful.

167. As a result, Ms. Marchant is entitled to unpaid wages, liquidated damages, attorney's fees, costs, interest, and all other relief allowed by law.

## COUNT IV
## FLSA / EQUAL PAY ACT RETALIATION
## 29 U.S.C. § 215(a)(3)

168. Plaintiff incorporates the preceding paragraphs as if fully set forth herein.

169. The Equal Pay Act is part of the Fair Labor Standards Act and prohibits retaliation against an employee because she complained about unlawful pay practices or asserted rights protected by the Act.

170. Plaintiff engaged in protected activity when she complained that male Regional Asset Protection Managers performing the same job were being paid more than she was.

171. Plaintiff reasonably believed Defendant was violating federal equal pay protections and requested fair and equal treatment in compensation.

172. Plaintiff raised these concerns to Patrick Kernell on or about February 6, 2025, and followed up on or about February 11, 2025, and February 18–19, 2025.

173. Defendant knew Plaintiff had complained about unequal pay between male and female employees performing the same job.

174. Shortly after Plaintiff complained about unequal pay, Defendant solicited, gathered, and relied upon stale, vague, and previously undisclosed complaints about Plaintiff's communication style.

175. Defendant terminated Plaintiff on or about March 21, 2025.

176. Defendant's termination of Plaintiff would dissuade a reasonable employee from complaining about unequal pay or asserting rights protected by the Equal Pay Act.

177.  Defendant terminated Plaintiff because she complained about unequal pay and asserted rights protected by the Equal Pay Act.

178.  Defendant violated 29 U.S.C. § 215(a)(3).

179.  As a direct and proximate result of Defendant's retaliation, Plaintiff suffered lost wages, lost benefits, emotional distress, reputational harm, and other damages recoverable by law.

**COUNT V**
**SOUTH CAROLINA HUMAN AFFAIRS LAW**
**SEX DISCRIMINATION / COMPENSATION DISCRIMINATION**
**S.C. Code Ann. § 1-13-80**

180.  Plaintiff incorporates the preceding paragraphs as if fully set forth herein.

181.  Plaintiff is a woman and is therefore a member of a protected class under the South Carolina Human Affairs Law.

182.  Defendant was Plaintiff's employer within the meaning of the South Carolina Human Affairs Law.

183.  Plaintiff was qualified for her position as Regional Asset Protection Manager and performed her job satisfactorily.

184.  Plaintiff performed work requiring substantially similar skill, effort, responsibility, and working conditions as male Regional Asset Protection Managers.

185.  Plaintiff was paid less than male Regional Asset Protection Managers performing the same or substantially similar work.

186.  Defendant's own compensation data confirms that multiple male Regional Asset Protection Managers reporting to the same supervisor earned more than Plaintiff while performing the same job.

187.  Defendant also treated Plaintiff less favorably than similarly situated male employees in the terms, conditions, and privileges of employment, including compensation, discipline, investigation, and termination.

188.  Defendant's stated reasons for its conduct are false, inconsistent, selectively enforced, and pretextual.

189.  Defendant discriminated against Plaintiff because of her sex in violation of the South Carolina Human Affairs Law.

190. As a direct and proximate result of Defendant's unlawful conduct, Plaintiff suffered damages, including lost wages, lost benefits, emotional distress, reputational harm, and other damages allowed by law.

## COUNT VI
## SOUTH CAROLINA HUMAN AFFAIRS LAW
## RETALIATION
## S.C. Code Ann. § 1-13-80

191. Plaintiff incorporates the preceding paragraphs as if fully set forth herein.

192. Plaintiff engaged in protected activity under the South Carolina Human Affairs Law when she opposed sex-based pay discrimination.

193. Specifically, Plaintiff told her supervisor that male Regional Asset Protection Managers were making more money than she was while performing the same job and that she wanted to be treated fairly and equally to her male peers.

194. Plaintiff raised this protected concern on or about February 6, 2025, and followed up again on or about February 11, 2025, and February 18–19, 2025.

195. Defendant knew that Plaintiff had raised concerns about unequal compensation based on sex.

196. Shortly after Plaintiff engaged in protected activity, Defendant began relying on stale, vague, and previously undisclosed complaints about Plaintiff's communication style.

197. Defendant did not contemporaneously notify Plaintiff of those alleged complaints.

198. Defendant did not interview Plaintiff regarding the alleged complaints.

199. Defendant did not give Plaintiff an opportunity to respond.

200. Defendant did not apply progressive discipline, coaching, or corrective counseling before terminating Plaintiff.

201. Defendant terminated Plaintiff on or about March 21, 2025.

202. The close temporal proximity between Plaintiff's protected activity and termination, Defendant's deviation from ordinary investigatory and disciplinary procedures, and Defendant's reliance on post-hoc and selectively gathered complaints support a causal connection between Plaintiff's protected activity and Defendant's adverse action.

203.    Defendant retaliated against Plaintiff because she opposed unlawful sex-based pay discrimination.

204.    Defendant's conduct violated the South Carolina Human Affairs Law.

205.    As a direct and proximate result of Defendant's retaliation, Plaintiff suffered damages, including lost wages, lost benefits, emotional distress, reputational harm, and other damages allowed by law.

## COUNT VII
## SOUTH CAROLINA PAYMENT OF WAGES ACT
## S.C. Code Ann. § 41-10-10, et seq.

206.    Plaintiff incorporates the preceding paragraphs as if fully set forth herein.

207.    Defendant was Plaintiff's employer within the meaning of the South Carolina Payment of Wages Act.

208.    Plaintiff was an employee within the meaning of the South Carolina Payment of Wages Act.

209.    Plaintiff earned wages, salary, benefits, and/or accrued paid time off/vacation during her employment with Defendant.

210.    Upon information and belief, under Defendant's policies, practices, agreements, or representations, Plaintiff was entitled to payment of all wages due upon separation, including any accrued and payable vacation/PTO.

211.    Plaintiff had scheduled and/or earned vacation/PTO immediately before her termination.

212.    Defendant terminated Plaintiff on or about March 21, 2025, immediately before she was scheduled to use vacation/PTO.

213.    Defendant failed to pay Plaintiff all wages due following separation, including earned and payable vacation/PTO and/or other compensation due under Defendant's policies or practices.

214.    Defendant failed to pay all wages due within the time required by South Carolina law.

215.    Defendant's failure to pay all wages due was willful and without good-faith basis.

216.    Defendant violated the South Carolina Payment of Wages Act.

217.  Plaintiff is entitled to recover all unpaid wages, statutory damages, costs, attorney's fees, interest, and all other relief available under the South Carolina Payment of Wages Act.

## DAMAGES

218.  As a result of Defendant's unlawful conduct, Ms. Marchant has suffered and continues to suffer damages, including but not limited to:

219.  Lost back pay.

220.  Lost front pay.

221.  Lost employment benefits.

222.  Plaintiff is entitled to compensatory damages under Title VII and the South Carolina Human Affairs Law, unpaid wages and liquidated damages under the Equal Pay Act/FLSA, statutory damages under the South Carolina Payment of Wages Act, prejudgment interest, post-judgment interest, equitable relief, and all other relief permitted by law.

223.  Emotional distress, anxiety, humiliation, embarrassment, and loss of professional reputation.

224.  Out-of-pocket expenses.

225.  Tax consequences and other consequential damages.

226.  Attorney's fees and costs.

227.  Plaintiff is entitled to compensatory damages, liquidated damages under the Equal Pay Act, prejudgment interest, post-judgment interest, equitable relief, and all other relief permitted by law.

228.  Defendant acted with malice or reckless indifference to Plaintiff's federally protected rights, entitling Plaintiff to punitive damages under Title VII.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiff respectfully requests that this Court enter judgment in her favor and award the following relief:

a. Declare that Defendant violated Title VII, the Equal Pay Act/FLSA, the South Carolina Human Affairs Law, and the South Carolina Payment of Wages Act;b. Award back pay, front pay, lost benefits, and other economic damages;

c. Award compensatory damages;

d. Award liquidated damages under the Equal Pay Act;

e. Award punitive damages under Title VII;

f. Award prejudgment and post-judgment interest;

g. Award statutory damages available under the South Carolina Payment of Wages Act;

h. Award attorney's fees and costs;

i. Order appropriate equitable relief, including reinstatement or front pay in lieu of reinstatement;

j. Award such other and further relief as the Court deems just and proper.

**RESPECTFULLY SUBMITTED:**

> **The Whitsitt Law Firm**
> /s <u>Michael A. Whitsitt</u>
> Fed. Bar Number #12505
> 78 Folly Road Suite B9
> #1405
> Tele:   8435487551
> Email:
> Michael@WhitsittLawfirm.com
> Charleston, South Carolina 29407
> *Attorney for Plaintiff*

July 1, 2026